UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CIVIL ACTION NO. 5:21-CV-00236-KKC-EBA

CARLTON E. MCINTOSH, SR.,                                          PLAINTIFF,

V.                          **REPORT AND RECOMMENDATION**

COOKIE CREWS, *et al.*,                                          DEFENDANTS.

*** *** *** ***

This matter is before the Court on Defendants' Wellpath Correct Care Solutions, Dannell Brown, Ricky Richards, Kim Dewhurst, John Goff, and Angela Clifford, M.D.'s Motion for Summary Judgment. [R. 87]. Plaintiff Carlton McIntosh filed a response, [R. 91], and Defendants filed a reply, [R. 92]. For the reasons that follow, the undersigned will RECOMMEND that the Court GRANT Defendants' Motion for Summary Judgment.

**I.**

Plaintiff Carlton McIntosh is currently housed at Blackburn Correctional Complex, which is a facility operated by the Kentucky Department of Corrections. [R. 8 at pg. 2]. McIntosh alleges that, on March 26, 2021, while housed at Southeast Correctional Complex (SECC), he fell out of a top bunk bed. [*Id.* at pg. 5]. McIntosh was taken to the McDowell Appalachian Regional Hospital (ARH) where the attending physician closed two severe lacerations on his head and performed a CT scan. [*Id.*; R. 87-1 at pg. 10]. According to McIntosh, the CT scan showed a subdural hematoma in his brain and an acoustic neuroma in his inner ear. [*Id.* at pg. 5]. The Emergency Department Note from ARH states, in relevant part, "[s]light prominence both compatible cerebellar pontine angle areas question underlying acoustic neuromas recommend MRI with contrast." [R. 87-1 at

pg. 21]. The report goes on to say, "[p]ossible underlying acoustic neuromas in the posterior fossa recommend MRI with contrast using thin slice technique. If there is clinical concern for acute infarct a follow up CT or prompt MRI may be helpful." [R. 87-1 at pg. 10]. McIntosh asserts that the attending physician at ARH said that he should return to the hospital in a week to have an MRI. [*Id.*]. However, the instructions on the Emergency Department Note state, "[f]ollow-up with primary care provider in 1 week. Return to emergency department any new worsening symptoms," and instructed McIntosh to return for suture removal in 10 days. [*Id.* at pg. 12]. The records pursuant to McIntosh's March 16, 2021, hospitalization and CT scan do not mention a subdural hematoma.

Around March 26, 2021, ten days after McIntosh visited ARH, Dannell Brown (Nurse at SECC) removed the staples from McIntosh's head. [R. 8 at pg. 5; R. 87-3 at pgs. 6, 8]. According to McIntosh, he told Brown that he had severe headaches, shoulder, neck, and back pain, and asked Brown when he was going for the follow- up MRI. [*Id.*]. Brown told McIntosh that he did not know anything about an MRI. [*Id.* at pg. 7]. McIntosh told Brown that, while at the hospital on March 16, 2021, the emergency room physician found a subdural hematoma in McIntosh's brain and an acoustic neuroma in his inner ear and instructed McIntosh to return for an MRI. [*Id.*]. McIntosh also told Brown that he has been perscribed Xarelto, a blood thinner, for the last two years. [R. 8 at pg. 20]. Brown's notes from the March 26, 2021, visit state that McIntosh complained of soreness in his shoulder and dizziness, but denied any nausea or vomiting, blurred vision, seizures, or seizure activity. [R. 87-3 at pg. 6]. Brown told McIntosh to return to medical right away if he experienced "confusion, [headache], vision disturbances (double or blurry vision), dizziness or imbalance, nausea or vomiting, memory loss, ringing in ears, or difficulty concentrating, or for any other concerns," and "that further studies may need to be done for

incidental finding of a possible acoustic neuroma. [R. 87-3 at pg. 9]. Brown told McIntosh to return in one month for follow up and to take Tylenol for his pain. [R. 87-3 at pg. 9].

Around April 19, 2021, McIntosh requested a medical visit. [R. 87-3 at pg. 44]. Notes from the medical visit with Dannel Brown, state, "head CT during ER visit showed possible acoustic neuroma, but no acute bleed. Head laceration is now fully healed, but still [complains of] dizziness." [R. 87-3 at pg. 44]. Brown's notes state that he would request an MRI to further evaluate the possible acoustic neuroma. [R. 87-3 at pg. 53].

McIntosh asserts that he continued to suffer headaches, dizziness, and pain in his neck, shoulder, and back, over the next few weeks, but Brown never scheduled the follow-up MRI. [R. 8 at pg. 8]. On May 5, 2021, during another medical visit with Brown, McIntosh complained of dizziness and shoulder pain, and requested to return to the hospital for an MRI. [R. 8 at pg. 8; R. 87-3 at pg. 13]. Brown directed McIntosh to continue shoulder exercises, stretch, and use Mobic as needed for his shoulder pain. [*Id.* at pg. 17]. In reference to McIntosh's dizziness, Brown's notes state, "[i]nitial head CT completed in ER showed no acute bleeding but showed possible acoustic neuroma; recommend MRI for further evaluation." [*Id.*]. Brown asserts that McIntosh made no complaint of headaches on May 5, 2021. [R. 87-4 at pg. 1]. On May 6, 2021, McIntosh was transferred to the Blackburn Correctional Complex (BCC) in Lexington, Kentucky. [R. 8 at pg. 8]. Brown did not schedule an MRI for McIntosh prior to his May 6, 2021, transfer. [R. 87-3 at pg. 54].

On May 10, 2021, McIntosh saw Rick Richards (Nurse at BCC) for a medical visit. [R. 87-3 at pg. 18]. Upon review of McIntosh's medical records, Richards noted that McIntosh "has an MRI of head referred that was entered at SECC 4/19 but was never scheduled or done for possible neuroma that was picked up on a CT scan done in the ER after a fall." [R. 87-3 at pg. 18]. Richards

scheduled a physical exam for McIntosh to occur on May 17, 2021, and advised that he would review McIntosh's need for MRI at that time. [R. 87-3 at pg. 20]. On May 17, 2021, McIntosh asserts that he told Richards about his March 16, 2021, diagnosis of a subdural hematoma and acoustic neuroma diagnoses from ARH and that he was experiencing severe headaches and "felt like he was dying." [*Id.* at pg. 9]. Richards notes from the visit state, "[i]t was recommended that patient undergo an MRI with contrast, but patient has metal plate and screws in left arm. We will contact UK Radiology and UK ENT for what imaging studies prior to referral to them for condition." R. 87-3 at pg. 22]. Richards' notes also state, "[i]n 2014 patient was hospitalized for a pulmonary embolism at UK hospital patient had a saddle clot in the pulmonary artery and was told by vascular surgeon that he would need to stay on blood thinner the rest of his life." [R. 87-3 at pg. 29]. Richards asserts that "headache did not come up as a significant issue that needed to be addressed," during the May 17, 2021, medical visit. [R. 87-4 at pg. 1].

On May 26, 2021, Mcintosh had a medical visit with Nurse Amy Lindon at BCC and complained that his headaches had gotten worse but had no funds to purchase Tylenol. [*Id.*; R. 87-3 at pg. 55]. McIntosh was given Tylenol during the visit. [*Id.* at pg. 57]. On May 28, 2021, McIntosh had a follow-up medical appointment with Dr. Angela Clifford (physician at BCC) for hearing issues that were discovered during his prior physical exam. [R. 87-3 at pg. 32]. Dr. Clifford states that McIntosh did not complain of headaches on this date. [R. 87-5 at pg. 1]. Dr. Clifford ordered additional hearing tests for McIntosh. [*Id.*]. However, according to McIntosh, Dr. Clifford prescribed Acetaminophen and Excedrin for McIntosh's pain for several weeks, even though he told her that the medications were ineffective at treating his pain. [R. 8 at pg. 10].

According to McIntosh, in June 2021, he made several sick-call requests to the BCC medical department because he was experiencing "pain and confusion." [*Id.*]. On June 10, 2021,

during a visit with Nurse Jonathan Bowen at BCC, McIntosh complained of a worsening headache, dizziness, and balance issues. [R. 87-3 at pg. 59]. McIntosh says that he informed Bowen that he has experienced "serious pain" since he arrived at BCC. [R. 8 at pg. 11]. According to McIntosh, he was supposed to see Dr. Clifford for the June 10, 2021, visit, however after waiting for nearly an hour, Bowen told McIntosh to go back to his dormitory. [*Id.*]. Bowen made an appointment for McIntosh to see Dr. Clifford on June 25, 2021, for evaluation of his previous head injury and his requests for imaging studies. [R. 87-3 at pg. 61]. Bowen told McIntosh to continue Tylenol for headaches and return if his symptoms worsened or changed. [*Id.*].

Around June 14, 2021, McIntosh had a medical appointment with Richards and complained of intensifying headaches. [R. 87-3 at pg. 64-65]. Richards' notes from the visit state, "[i]t was recommended that patient undergo an MRI with contrast, but patient has metal plate and screws in left arm. UK Radiology contacted, indicated ok to order MRI brain." [R. 87-3 at pg. 64]. Richards prescribed Excedrin Migraine for McIntosh's pain. [R. 87-3 at pg. 67]. Plan notes state, "Headache/possible acoustic neuroma – MRI with contrast ordered per recommendation ER after CT scan of brain on March 16, [2021]." [R. 87-3 at pg. 67]. According to Richards, he "entered the consult for an MRI brain to better define the possible acoustic neuroma and also to rule out a more serious cause of what Mr. McIntosh described as progressively worsening headaches." [R. 87-4 at pg. 2].

A few days later, on June 18, 2021, McIntosh was taken to UK Healthcare Hospital Clinic for an MRI. [*Id.* at pg. 12; R. 87-3 at pg. 69]. Notes signed by Dr. Clifford from June 18, 2021, state, "[p]atient fell from top bunks March this year. He sustained a scalp laceration [and] lost consciousness. He was sent to ARH hospital where a CT was done showing an acoustic neuroma-laterality not noted. He had constant headaches since then [and] he rates them 8-10. He had an

MRI today. Says Excedrin Migraine helps but currently [two times daily] dosing does not last long enough. Point to temples [and] top of head as site of pain." [R. 87-3 at pg. 68]. "Appears uncomfortable. Holds his head at times." [*Id.*]. Dr. Clifford advised McIntosh to start taking 2 Excedrin 3 times a day and add Nortriptyline. [R. 87-3 at pg. 71].

According to McIntosh, later that afternoon, he lost mobility in his right arm and leg, lost the ability to speak, and became confused. [R. 8 at pg. 12]. McIntosh asserts he had to "drag one of his legs" to walk to the BCC medical building, and upon arrival, was "looked at" by a Corrections Officer and immediately transported to UK hospital. [R. 8 at pg. 12]. Richards asserts, however, that he received a call from Eric Jones (a nurse at BCC) in the afternoon of June 18, 2021, informing him that McIntosh's MRI was positive for a subdural hematoma, and accordingly, Richards ordered that McIntosh immediately be sent to the emergency room. [R. 87-4 at pg. 3]. On the afternoon of June 18, 2021, McIntosh was transferred to UK Hospital where physicians determined he was suffering a stroke due to a brain bleed. [*Id.* at pg. 13]. Physicians performed a CT scan and McIntosh underwent "emergency brain surgery" to place two burr holes. [*Id.*]. McIntosh remained in the hospital for three days following the surgery. [R. 8 at pg. 13].

Around June 21, 2021, McIntosh was discharged from the hospital. [*Id.*]. Upon discharge, McIntosh asserts that a UK physician told him to take 30 mg codeine tablets for the pain and gave him an information packet with post-surgery care instructions. [*Id.*]. Richards asserts that the discharge summary from UK on June 21, 2021, stated: "Please do not take Xarelto for 1 month. Please do not take aspirin NSAIDs for 1 month." [R. 87-4 at pg. 3]. Nurse Kim Dewhurst at BCC asserts that he saw McIntosh upon his return from the hospital and reviewed the discharge orders from the hospital with him. [R. 87-7 at pg. 1]. According to McIntosh, however, staff told him that

his patient information packet was lost. [R. 8 at pg. 13]. McIntosh additionally asserts that he could not have the codeine tablets because Dr. Clifford did not want narcotics on the BCC yard. [*Id.*].

On June 29, 2021, McIntosh complained of a severe headache and popping in his right ear during a medical appointment with Dewhurst. [R. 87-3 at pg. 73]. After consulting with Dr. Clifford, Dewhurst gave McIntosh Tylenol and advised him that if he became confused, then he should be sent to the hospital. [*Id.*].

Around August 24, 2021, McIntosh asserts that Dr. Clifford prescribed him a pain-relieving cream. [R. 8 at pg. 16]. McIntosh explained to Dr. Clifford that he suffered a pulmonary embolism in 2014 and was instructed to never use aspirin or ibuprofen while taking Xarelto because it could cause hemorrhaging. [*Id.*].

Around September 3, 2021, during an appointment with Dr. Clifford, McIntosh complained of headaches and episodes of confusion. [R. 87-3 at pg. 76]. According to McIntosh, during the appointment, Dr. Clifford "suddenly grabbed [McIntosh's] neck with a tight grip and began squeezing his neck on the left back side, causing [him] so much severe pain that it caused him to jerk away to stop her from further hurting him." [*Id.*]. According to Dewhurst, Dr. Clifford sent McIntosh out of the examining room after he "became belligerent when she attempted to palpate his neck because of his complaint of neck pain." [R. 87-7]. McIntosh asked Dewhurst when he could be seen again by Dr. Clifford, but Dr. Clifford said, she would not see him then "because he had been belligerent while she was attempting to assess his neck pain." [*Id.*]. Dewhurst sent McIntosh back to his dormitory. [*Id.*]. McIntosh filed an internal grievance regarding the appointment with Dr. Clifford. [R. 8 at pg. 15]. Sometime after the appointment that afternoon, Dr. Clifford contacted the neurology department at UK hospital about McIntosh's complaints of

confusion and UK staff advised Dr. Clifford to send McIntosh to the hospital. [R. 87-3 at pg. 79]. Dr. Clifford immediately sent McIntosh to UK hospital by car. [*Id.*].

After the September 3, 2021, hospital visit, upon return to BCC, McIntosh asserts that Dr. Clifford insisted that he use "Diclofenac cream which contains aspirin." [R. 8 at pg. 16]. Dr. Clifford's notes from around September 24, 2021, state, "In [McIntosh's] grievance, he is requesting that [Dr. Clifford] order the "cream" that [she] had mentioned at above visit." [R. 87-3 at pg. 80]. Dr. Clifford explained to McIntosh that she recommended Diclofenac (Voltaren) gel since patient was on a blood thinner and could not take oral or parental NSAID." [R. 87-3 at pg. 80]. McIntosh asserts that he experienced bleeding in the rectum and bloody stool four days after using the Diclofenac gel. [R. 8 at pg. 16].

**II.**

On September 21, 2021, McIntosh filed a *pro se* civil complaint against Defendants Cookie Crews, Kentucky Department of Corrections, Larry Chandler, Dannel Brown, Abby McIntire, Wellpath Correct Care Solutions, John Goff, Dr. Angela Clifford, Rick Richards, Jonathan Bowen, and "Nurse Kem" (later identified as Kim Dewhurst), pursuant to 42 U.S.C. § 1983. [R. 1]. On December 13, 2021, McIntosh filed an Amended Complaint against Defendants in their official and individual capacities, pertaining to the defendants' alleged: failure to provide reasonable safety; failure to provide a safe sleeping environment; and denial of medical care. [R. 8; R. 14 at pg. 3].

On May 25, 2022, the Court construed McIntosh's amended complaint as a motion for leave to file an amended complaint and granted it. [R. 14 at pgs. 1-2]. In the same order, the Court dismissed McIntosh's claims against Kentucky Department of Corrections, Commissioner Cookie Crews, Warden Larry Chandler, and Warden Abby McIntire for failure to state a claim for which

relief may be granted. [*Id.* at pg. 22]. On October 2, 2023, the Court granted Dr. Clifford's motion to dismiss the medical malpractice claim against her. [R. 90]. Accordingly, the following claims remain pending:

1. Dannell Brown (Nurse at SECC), in his official and individual capacities, was deliberately indifferent to McIntosh's medical needs in violation of the Eighth Amendment and committed malpractice with respect to McIntosh's medical care when he failed to discontinue McIntosh's Xarelto prescription and did not schedule an MRI for his consistent pain or for further evaluation following his head injury. [R. 14 at pg. 6; R. 8 at pgs. 7-8].

2. John Goff (Health Services Administrator at BCC), in his official and individual capacities, was deliberately indifferent to McIntosh's medical needs in violation of the Eighth Amendment when he failed to schedule McIntosh for an MRI upon his arrival at BCC. [R. 8 at pg. 9].

3. Rick Richards (Nurse at BCC), in his official and individual capacities, was deliberately indifferent to McIntosh's medical needs in violation of the Eighth Amendment, grossly negligent, and committed malpractice with respect to McIntosh's medical care when he failed to schedule McIntosh for an MRI and failed to effectively manage his pain. [*Id.*; R. 8 at pgs. 9-11].

4. Dr. Angela Clifford (Physician at BCC), in her official and individual capacities, was deliberately indifferent to McIntosh's medical needs in violation of the Eighth Amendment, and grossly negligent when she failed to schedule a follow up exam or MRI following McIntosh's complaints of severe headache, did not allow him the pain medication prescribed by UK physicians following his brain surgery, and grabbed McIntosh's neck in an "assaultive manner" during a healthcare visit. [*Id;* R. 8 at pg. 11-14].

5. Jonathan Bowen (Director of Nurses at BCC), in his official and individual capacities, was deliberately indifferent to McIntosh's medical needs in violation of the Eighth Amendment, grossly negligent, and committed malpractice with respect to McIntosh's medical care when he failed to schedule McIntosh for an MRI until June 2021 and sent McIntosh back to his dorm without receiving medical attention. [R. 8 at pgs. 10-12].

6. Kim Dewhurst (Nurse at BCC), in his official and individual capacities, referred to in McIntosh's Amended Complaint as "Nurse Kem," at BCC) was deliberately indifferent to McIntosh's medical needs in violation of the Eighth Amendment and grossly negligent based on his alleged failure to aid him after Clifford allegedly grabbed his neck and told McIntosh to go back to his dorm without having received medical treatment. [*Id.*; R. 8 at pg. 15].

7. Wellpath Correct Care Solutions (Defendants' employer) was negligent as the entity contracted to provide health services for all KDOC facilities. [*Id.*].

McIntosh seeks injunctive relief against Clifford, "and [her] agents," to "immediately arrange for [McIntosh's] need for physical therapy or other follow-up medical treatment to be evaluated by a medical practitioner with expertise in neurological treatment, and orthopedic

restoration of functions of [McIntosh's] shoulder, neck, and back." [R. 8 at pg. 17]. McIntosh seeks compensatory damages in the amount of $12,500,000 against Defendants' employer, Wellpath Correct Care Solutions. [*Id.*]. McIntosh also seeks punitive damages in the following amounts: (1) $50,000 against Goff; and (2) $40,000 against Brown, Clifford, Richards, Bowen, and Kim Dewhurst. This matter is now before the Court on Defendants' Wellpath, Brown, Richards, Dewhurst, Goff, and Clifford's Motion for Summary Judgment. [R. 87]. Defendant Bowen does not move for summary judgment. [R. 87].

## III.

Entry of summary judgment is appropriate if there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). At summary judgment, the moving party has the initial burden to demonstrate the absence of genuine dispute as to any material fact. *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). A disputed issue is "genuine" only if a sufficient evidentiary basis exists on which a reasonable jury could find for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radop Corp.*, 475 U.S. 574, 586 (1986). The nonmovant must provide evidence beyond the pleadings and provide probative evidence to support its claims. *Celotex*, 477 U.S. at 324. "When ruling on a motion for summary judgment, a court must consider the evidence 'in the light most favorable to the party

opposing the motion." *Risher v. Lappin,* 639 F.3d 236, 239 (6th Cir. 2011) (quoting *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)).

**IV.**

Defendants argue that the evidence, when construed in favor of McIntosh, establishes that

there is no genuine dispute of material fact, and accordingly, assert that they are entitled to

judgment as a matter of law. [R. 87 at pg. 1]. Defendants assert: (1) claims against Goff and

Wellpath must be dismissed for failure to state a claim for which relief can be granted; (2)

McIntosh cannot show that Defendants Brown, Richards, Clifford, Goff, or Dewhurst acted with

deliberate indifference to McIntosh's serious medical needs in violation of the Eighth Amendment;

and (3) McIntosh cannot produce an expert opinion on the relevant standard of care, breach of

standard of care, or causation to establish his medical negligence claim. [*Id.*].

### 1. Failure to State a Claim

### A. Goff

McIntosh asserts that Goff was deliberately indifferent to McIntosh's medical needs in

violation of the Eighth Amendment when he failed to make McIntosh an appointment to an outside

hospital, immediately upon his arrival at BCC on May 6, 2021. "A complaint is subject to dismissal

for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to

relief." *Jones v. Bock,* 549 U.S. 199, 215 (2007). According to Goff, he oversaw the medical

department as Healthcare Services Administrator, but did not oversee medical care nor treatment

of inmates. [R. 87-6 at pg. 1]. While McIntosh asserts that Goff was responsible for scheduling

medical appointments outside the prison when a prisoner needs specialized treatment or

evaluation, as Defendants point out, Goff's role was strictly administrative, and he did not provide

medical care to McIntosh. [R. 8 at pg. 9; R. 87 at pg. 7]. McIntosh does not allege that a medical

provider instructed Goff to schedule an MRI. McIntosh asserts that Goff should have unilaterally scheduled an MRI for him upon his arrival to BCC because he did not, he was deliberately indifferent to McIntosh's health needs. However, because Goff did not provide any medical care to McIntosh regarding his complaints of headaches, confusion, or requests for an MRI, as his role was purely administrative, McIntosh fails to show that he is entitled to relief from Goff.

### B. Wellpath

Similarly, McIntosh's claims against Wellpath must be dismissed because he failed to state any claims against it. McIntosh brings his claims against Wellpath as the employer of the remaining Defendants, however Wellpath can only be liable as Defendants' employer if there is a direct causal link between a Wellpath policy or custom and the alleged constitutional violation. *Rouster v. Saginaw Cnty.,* 749 F.3d 437, 453 (6th Cir. 2014); *see Monnell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978). Private corporations, like Wellpath, that perform the traditional state function of providing medical services to prison inmates may be sued under § 1983. *Rouster,* 749 F.3d at 453. Wellpath cannot be held liable *solely* because it employs a tortfeasor, but rather must be based on a policy or custom of the entity. *Id.*; *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996); *see also Starchery Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001) ("[Correctional Medical Systems, Inc.'s] liability must also be premised on some policy that caused a deprivation of [plaintiff's] Eighth Amendment rights.") Here, McIntosh does not allege that he weas denied medical treatment pursuant to a policy or custom of Wellpath. In his response to Defendants' motion for summary judgment, he broadly states that "[a]ny jury could find from the evidence in the record that Wellpath's training policies were deficient or caused the Plaintiff's injuries in this case." [R. 91 at pg. 7]. However, McIntosh does not allege which policies he is referring to and, importantly, does not mention any Wellpath

policies or customs in his complaint. McIntosh solely alleges the denial of treatment that affects only him. Accordingly, McIntosh's claim against Wellpath should be dismissed for failure to state a claim upon which relief can be granted.

### 2. Eighth Amendment Deliberate Indifference

A state can "run afoul" of the Eighth Amendment by "failing to give prisoners the medical care that they need to prevent pain and suffering from their health conditions." *Phillips v. Tangilag,* 14 F.4th 524, 532 (6th Cir. 2021). To prove this type of claim under 42 U.S.C. § 1983, a plaintiff must show that each defendant acted under color of state law and that each defendant individually was deliberately indifferent to the prisoner's serious medical needs. *West v. Atkins,* 487 U.S. 42, 48–49 (1988). The parties here do not dispute that Defendants were acting under color of state law in their interactions with McIntosh. Parties contracting with the state to provide services to inmates, like Wellpath, can be considered state actors for purposes of a 42 U.S.C. § 1983 suit. *West v. Atkins,* 487 U.S. 42, 44 (1988); *Carl v. Muskegon Cnty.,* 763 F.3d 592, 596 (6th Cir. 2014).

The Eighth Amendment prohibits prison officials and doctors from showing deliberate indifference to an inmate's serious medical needs. *Mattox v. Edelman,* 851 F.3d 583, 597 (6th Cir. 2017) (citation omitted). To establish a deliberate indifference claim, the prisoner must show that he has a serious medical condition and that the Defendants displayed deliberate indifference to his health. *Estelle v. Gamble,* 429 U.S. 97 (1976); *Wilson v. Seiter,* 501 U.S. 294 (1991). In other words, a deliberate indifference claim has objective and subjective components: (1) "the objective component requires the existence of a sufficiently serious medical need," and (2) "the subjective component requires an inmate to show that prison officials have a sufficiently culpable state of mind in denying medical care." *Id.; Blackmore v. Kalamazoo Cnty.,* 390 F.3d 890, 895 (6th Cir. 2004).

### A.  Brown, Richards, Clifford failure to schedule MRI and Effectively Treat Pain

While McIntosh's medical needs may be sufficiently serious, McIntosh must allege facts showing that Defendants acted with knowing and culpable disregard for his well-being. *See Estelle v. Gamble,* 429 U.S. 97, 104–5 (1976). "The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalizing of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailments." *Johnson v. Karnes,* 398 F.3d 868, 875 (6th Cir. 2005). Here, McIntosh alleges that Defendants Brown, Richards, and Clifford knew he was diagnosed with a subdural hematoma on March 21, 2021, had ongoing headaches and episodes of confusion, and yet, failed to send him to the hospital for a follow up MRI. McIntosh also alleges that the Defendants failed to effectively manage his pain and failed to discontinue Xarelto. All of which, McIntosh asserts, caused him to suffer the June 18, 2021, brain bleed.

The record shows that Defendants Brown, Richards, and Clifford, knew of the following: (1) McIntosh endured a head injury on March 21, 2021; (2) the CT scan performed at ARH on March 21, 2021, showed a possible acoustic neuroma; (3) McIntosh experienced severe headaches over several weeks and had episodes of dizziness; (4) physicians at ARH recommended a follow-up MRI, and (5) McIntosh persistently requested a follow-up MRI for weeks following his initial injury. [R. 87-1 at pgs. 7, 10; R. 87-3 at pgs. 2, 5-7, 15, 17, 22, 40, 51, 55, 59, 64, and 69]. Defendants concede that a subdural hematoma diagnosis would require immediate medical attention, however the record does not show that McIntosh was diagnosed with a subdural hematoma on March 21, 2021. [R. 87-1 at pg. 10]. While McIntosh asserts that Defendants ignored his subdural hematoma diagnosis, he does not provide any evidence, conflicting the medical records, showing that he had an earlier diagnosis of a subdural hematoma that went ignored.

The record does reflect, however, that Defendants treated McIntosh for headaches, noted his complaints of dizziness over several weeks, and ultimately scheduled a follow-up MRI. Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw,* 358 F.3d 377, 385 (6th Cir. 2004). However, "prison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment. Indeed, deliberate indifference may be established in cases where it can be shown that a defendant rendered grossly inadequate care or made a decision to take an easier but less efficacious court of treatment." *McCarthy v. Place,* 313 Fed. Appx. 810, 814 (6th Cir. 2008) (citing *Terrance v. Northville Reg'l Psychiatric Hosp.,* 286 F.3d 834, 843 (6th Cir. 2002)). To succeed, McIntosh must present evidence from which a reasonable jury could find that McIntosh's medical care was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Miller v. Calhoun Cnty.,* 408 F.3d 803, 819 (6th Cir. 2005) (citing *Terrance,* 286 F.3d at 844). McIntosh alleges that treating his pain with over-the-counter pain medication was not sufficient to treat his headaches and dizziness and that he should have received an earlier MRI to rule out other serious issues. While McIntosh may argue that treating McIntosh's headaches and delay in scheduling a follow-up MRI fell below the applicable standard of care, these allegations do not suggest medical care so grossly incompetent as to shock the conscience.

### B. Clifford

McIntosh additionally alleges that Clifford was deliberately indifferent to McIntosh's medical needs in violation of the Eighth Amendment when she did not allow him the pain medication prescribed by UK physicians following his brain surgery and prescribing Tylenol and

Excedrin instead. The record reflects that Excedrin Migraine and Xarelto were discontinued by University of Kentucky Medical Center after McIntosh suffered the June 18, 2021, brain bleed. [R. 87-3 at pg. 71]. UK prescribed codeine, which is a narcotic and, according to Defendants, not permitted to be taken by inmates because of security and safety concerns. [R. 87 at pg. 5]. Instead, Dr. Clifford prescribed McIntosh Tylenol. [*Id.*]. Insofar as McIntosh asserts that Dr. Clifford's refusal to allow him narcotic pain medication fell below the applicable standard of care, he fails to show that Dr. Clifford acted with deliberate indifference. McIntosh must present evidence from which a reasonable jury could find that McIntosh's medical care was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Miller v. Calhoun Cnty.,* 408 F.3d 803, 819 (6th Cir. 2005) (citing *Terrance,* 286 F.3d at 844). Here, while medical providers may prescribe different pain medications following brain surgery, there is no evidence that Dr. Clifford's care shocks the conscience or so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.

### C. Clifford and Dewhurst

McIntosh alleges that Clifford was deliberately indifferent to McIntosh's medical needs in violation of the Eighth Amendment when she grabbed McIntosh's neck in an "assaultive manner" during a healthcare visit causing him pain and refused to see McIntosh again on the same day. According to Dr. Clifford, she routinely palpates a patient's neck when they complain of neck pain in order to evaluate whether there are muscular skeletal issues which need to be treated. [R. 87 at pg. 5]. Clifford asserts that McIntosh had a "violent reaction" to her palpating his neck and she was concerned for her safety, and accordingly, sent him out of the room. [*Id.*]. During the visit, McIntosh complained of confusion and Clifford ultimately sent him to the UK emergency room that same day. However, as discussed above, McIntosh must show that Dr. Clifford had a

sufficiently culpable state of mind when denying him medical care to show a deliberate indifference claim. *Blackmore v. Kalamazoo Cnty.,* 390 F.3d 890, 895 (6th Cir. 2004). The record shows that Dr. Clifford refused to see McIntosh following the conflict because she was concerned for her safety. [R. 87 at pg. 5]. Despite this, McIntosh did receive care at UK hospital on the same day. Without more, McIntosh has failed to establish that Dr. Clifford acted with deliberate indifference.

Additionally, McIntosh alleges that Dewhurst was deliberately indifferent to McIntosh's medical needs in violation of the Eighth Amendment when Dewhurst came into the room after McIntosh's September 3, 2021, altercation with Clifford, denied his request to be seen by Dr. Clifford again the same day, and sent McIntosh back to his dorm. [R. 8 at pg. 15]. Dewhurst asserts that he asked Dr. Clifford whether she would see him again, but Dr. Clifford said she would not "because [McIntosh] had been belligerent." [R. 87 at pg. 7]. McIntosh asserts that Dewhurst's "failure and refusal to provide any medical aid" constituted deliberate indifference. However, as discussed above, McIntosh must show that Dewhurst had a sufficiently culpable state of mind when denying him medical care to show a deliberate indifference claim. *Blackmore,* 390 F.3d at 895. Here, Dewhurst denied McIntosh's request to see Dr. Clifford on the same day and sent him back to his dormitory because Dr. Clifford refused to see him. Without more information, McIntosh cannot assert that Dewhurst had a culpable state of mind to deny him care, but rather, only followed the directions of Dr. Clifford.

### 3. Negligence and Gross Negligence

To state a cause of action based on negligence under Kentucky law, a plaintiff must establish the following elements: (1) a duty on the part of the defendant; (2) a breach of that duty; and (3) consequent injury. *Mullins v. Commonwealth Life Ins. Co.,* 839 S.W2d 425, 247 (Ky.

1992). Under Kentucky law, a plaintiff alleging medical malpractice must prove that a medical provider failed to adhere to the standard of care a reasonably competent practitioner in the same medical field, proximately causing the plaintiff's injury. *Matthews v. Robinson,* 52 Fed. Appx. 808, 809 (6th Cir. 2002) (citing *Reams v. Stutler,* 642 S.W.2d 586, 588 (Ky. 1982)).

Generally, under Kentucky law, expert testimony is required to show that a medical provider failed to conform to the applicable standard of care and caused the plaintiff's injury. *Id.* (citing *Vance v. United States,* 90 F.3d 1145, 1148 (6th Cir. 1996). "The plaintiff in a medical negligence case is required to present expert testimony that establishes (1) the standard of skill expected of a reasonably competent medical practitioner and (2) that the alleged negligence proximately caused the injury." *Crafton v. United States,* 2021 WL 4220671, at *3 (E.D. Ky. Aug. 23, 2021) (citing *Andrew v. Begley,* 203 S.W.3d 165, 170 (Ky. Ct. App. 2006). To meet this standard, an expert is required to establish the applicable standard of care. "It is the Plaintiff's burden to find a doctor who will testify to the standard of treatment of each condition and testify that in his or her expert opinion, the standard was breached by the federal employee(s) in this case." *Id.* (citing *Sandler v. United States,* 2013 WL 5468493, at *6 (E.D. Ky. Sept. 30, 2013).

In McIntosh's supplemented expert disclosure, he advises that Dr. Buck "would give truthful testimony to the fact that he diagnosed a possible hematoma and acoustic neuroma after a CT Scan on March 16, 2021, and recommended [McIntosh] undergo an MRI within a week." [R. 60 at pg. 4]. Further, he advises that Buschmann "would give truthful testimony that she issued Patient instructions directly to [McIntosh]" and Cassle "would give truthful testimony of the resulting injuries the continued prescribing of medications containing aspirin and the blood thinner Xarelto, by Dr. Angela Clifford, caused the Plaintiff." [*Id.*]. The Court held that these disclosures

sufficiently put Defendants on notice of what McIntosh's experts are "expected to testify" about and what matter they are "expected to present evidence" on. Fed. R. Civ. P. 26(a)(2)(C).

However, as Defendants argue, McIntosh has not produced expert medical evidence to prove the standard of care for his injury, a breach of that standard, or causation, and that the record contains no evidence to support a finding under Kentucky law that the standard of care was violated in this case. [R. 87 at pg. 14]. As Federal Rule of Civil Procedure 56(c) makes clear, to assert that there is a genuine dispute of material fact, McIntosh must "cite to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other [such] materials." Fed. R. Civ. P. 56(c)(1)(a). McIntosh cannot rely on his own claims or arguments without sufficient evidence. *Id.*; *see Wymer v. JH Properties, Inc.,* 50 S.W.3d 195, 199 (Ky. 2001).

In *Crafton*, where a *pro se* prisoner brought suit *pro se* alleging improper medical care, even accepting the plaintiff's factual allegations as true, where he failed to establish the applicable duty of care through expert testimony, as required by Kentucky law, his medical negligence claim fails as a matter of law. *Crafton v. United States,* 2021 WL 4205605, at * (E.D. Ky. Sept. 15, 2021) (citing *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.,* 120 S.W.3d 682, 687-88 (Ky. 2003), *as amended* (Aug. 27, 2003); *Mullins v. Commonwealth Life Ins. Co.,* 839 S.W.2d 245, 247 (Ky. 1997)). Similarly, here, where McIntosh has failed to meet his evidentiary burden and there is no genuine issue of fact as to the standard of care, Defendants' motion for summary judgment must be granted.

### 4. Medical Malpractice

Similarly, under Kentucky law, a plaintiff alleging medical malpractice must also put forth expert testimony to show that the defendant medical provider failed to conform to the standard of

care. *Blakenship v. Collier,* 302 S.W.3d 665, 670 (Ky. 2010). "To establish a prima facie case of medical malpractice, a plaintiff must introduce evidence, in the form of expert testimony, demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant...." *Sandler v. United States*, 2013 WL 5468493, at *6 (E.D. Ky. Sept. 30, 2013) (quoting *Heavrin v. Jones*, 2003 WL 21673958, at * 1 (Ky. Ct. App. July 18, 2003)). "It is the Plaintiff's burden to find a doctor who will testify to the standard of treatment of each condition and testify that in his or her expert opinion, the standard was breached by the federal employee(s) in this case." *Id*. (quoting *Hernandez v. United States*, 2009 WL 1586809, at *6 (E.D. Ky. June 5, 2009)). Similarly, here, where McIntosh has failed to meet his evidentiary burden establishing a standard of care of care, and there is no genuine issue of fact as to the standard of care, Defendants' motion for summary judgment must be granted.

## V.

For the reasons stated above, **IT IS RECOMMENDED THAT** Defendants Wellpath Correct Care Solutions, Dannell Brown, Ricky Richards, Kim Dewhurst, John Goff, and Angela Clifford, M.D.'s Motion for Summary Judgment, [R. 87], be **GRANTED**.

*** *** *** ***

The parties are directed to 28 U.S.C. § 636(b)(1) for a review of appeal rights governing this Recommended Disposition. Particularized objections to this Recommended Disposition must be filed within fourteen days from the date of service thereof or further appeal is waived. *United States v. Campbell*, 261 F.3d 628, 632 (6th Cir. 2001); *Thomas v. Ann*, 728 F.2d 813, 815 (6th Cir. 1984). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal. *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). A party may file a response to another party's objections

within fourteen days after being served with a copy thereof. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(1).

Signed August 9, 2024.



Signed By:
*Edward B. Atkins* ℰℬₐ
United States Magistrate Judge